UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KIMBERLY WOODRING,

       Plaintiff,

    -vs-              05-CV-559C

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

---

Plaintiff Kimberly Woodring initiated this action pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") denying her application for Social Security disability ("SSDI") benefits. The Commissioner has filed a motion for judgment on the pleadings, and the plaintiff has cross-moved for the same relief, pursuant to Fed. R. Civ. P 12(c). For the following reasons, the Commissioner's motion is denied, and plaintiff's cross-motion is granted.

## BACKGROUND

Plaintiff was born on June 9, 1968 (T. 42).[1] She applied for SSDI benefits on July 28, 2003, with an alleged disability onset date of November 12, 2001 (T. 42). She alleges disability based on bilateral carpal tunnel syndrome (T. 60).[2] Plaintiff's application was denied on December 1, 2003 (T. 31). Plaintiff requested an administrative hearing,

---

[1] References preceded by "T." are to page numbers of the transcript of the administrative record filed by defendant as part of the answer to the complaint (Item 6).

[2] The plaintiff also suffers from mild depression, but no part of plaintiff's motion is directed at this diagnosis.

which was held on February 28, 2005 before Administrative Law Judge ("ALJ") James Quinlivan (T. 35, 291-320). On April 29, 2005, the ALJ determined that plaintiff was not disabled and not entitled to SSDI benefits (T. 11-23).

The ALJ's decision became the Commissioner's final determination on July 6, 2005 when the Appeals Council declined plaintiff's request for review (T. 4-6). On August 9, 2005, plaintiff instituted this action, seeking judicial review of the Commissioner's final determination (Item 1). The Commissioner filed an answer on November 18, 2005 (Item 6) and a motion for judgment on the pleadings on April 17, 2006 (Item 11). Plaintiff cross-moved for the same relief on June 12, 2006 (Item 13).

## DISCUSSION

**I.   Scope of Judicial Review**

Under the Social Security Act, a person is entitled to Social Security disability benefits when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Melville v. Apfel*, 198 F.3d 45, 50 (2d Cir. 1999). Such a "physical or mental impairment" must be demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). Determinations of disability are based on objective medical facts, diagnoses, or medical opinions inferable from these facts, subjective complaints of pain or disability, and educational background, age, and work experience. *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992).

The Social Security Act states that, upon district court review of the Commissioner's decision, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g). Substantial evidence is defined as evidence which "'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see also Tejada v. Apfel,* 167 F.3d 770, 773-74 (2d Cir. 1999). Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may neither try the case *de novo* nor substitute its findings for those of the Commissioner. *Richardson,* 402 U.S. at 401. "The court's sole inquiry is 'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Winkelsas v. Apfel,* 2000 WL 575513, at *2 (W.D.N.Y. February 14, 2000) (quoting *Sample v. Schweiker,* 694 F.2d 639, 642 (2d Cir. 1982).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Gartmann v. Sec'y of Health and Human Servs.,* 633 F. Supp. 671, 680 (E.D.N.Y. 1986) (quoting *Klofta v. Mathews,* 418 F. Supp. 1139, 1141 (E.D.Wis. 1976). The Commissioner's determination cannot be upheld when it is based on an erroneous view of the law that improperly disregards highly probative evidence. *Tejada,* 167 F.3d at 773.

**II.      Standards for Determining Eligibility for Disability Benefits**

The regulations set forth a five-step process for the ALJ to follow in evaluating disability claims. *See* 20 C.F.R. § 404.1520. First the ALJ must determine whether the claimant is presently engaged in substantial gainful activity. If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant's impairment is severe, the ALJ then determines whether it meets or equals the criteria of an impairment found in 20 C.F.R. § 404, Subpart P, Appendix 1 (the "Listings"). If the impairment meets or equals a listed impairment, the claimant will be found to be disabled. If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant is capable of performing his or her past relevant work. Finally, if the claimant is not capable of performing the past relevant work, the fifth step requires that the ALJ determine whether the claimant is capable of performing other work which exists in the national economy, considering the claimant's age, education, past work experience and residual functional capacity ("RFC"), based on a series of charts provided in the regulations at 20 C.F.R. § 404. Subpart P, Appendix 2 (the "Grids"). *See Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir. 2000); *Reyes v. Massanari,* 2002 WL 856459, at *3 (S.D.N.Y. April 2, 2002).

The claimant bears the burden of proof with respect to the first four steps of the analysis. If the claimant demonstrates an inability to perform past work, the burden shifts to the Commissioner to show that there exists other work that the claimant can perform.

*See Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ determined that plaintiff had not engaged in substantial gainful employment activity since the date of the alleged disability onset (T. 15). In reviewing plaintiff's medical records, the ALJ found that plaintiff suffers from a medically determinable condition that significantly limits her ability to perform basic work activity and thus suffers from a "severe" impairment for purposes of the regulations (T. 16). The ALJ further concluded, however, that plaintiff's impairments, individually or in combination, did not meet or equal the requirements of the Listings (T. 17). Proceeding to the fourth step of the sequential evaluation process, based on the medical record and plaintiff's subjective complaints, the ALJ found that plaintiff is unable to perform her past relevant work as a data entry clerk, clerk typist, and blueprint machine operator (T. 20). The ALJ further found that plaintiff has the RFC to perform a significant range of light work (T. 22). Relying on the testimony of a vocational expert ("VE"), the ALJ found that plaintiff could perform various jobs in the national economy including usher/lobby attendant, school bus monitor, teacher's aide, information clerk/receptionist, telephone marketer/solicitor, and customer complaint clerk (T. 22). Accordingly, the ALJ concluded that plaintiff was not disabled for purposes of the Social Security Act at any time since the alleged onset of disability (T. 22).

The Commissioner contends that the ALJ's findings are supported by substantial evidence. Plaintiff contends that the ALJ misapplied the established legal and regulatory standards in finding that plaintiff could perform a wide range of light work. She argues that the ALJ failed to give the appropriate consideration to the opinion of her treating physician and erred in accepting the RFC determination of the State Agency review physicians.

Additionally, plaintiff argues that while the ALJ stated that plaintiff had no transferable skills, he relied on a vocational expert to conclude that plaintiff could perform skilled jobs.

**III.    The Medical Evidence**

On June 19, 2001, plaintiff underwent surgery on her right wrist for carpal tunnel syndrome (T. 116-17).  On July 13, 2001, she was seen by Dr. John J. Callahan, her orthopedic surgeon.  Dr. Callahan noted grip strength of 38 pounds on the right, and 76 pounds on the left.  Swelling was down considerably, and sensation in plaintiff's right hand was normal (T. 254).  At that time, Dr. Callahan stated that plaintiff was able to return to work (T. 254).

On October 12, 2001, plaintiff saw Dr. Callahan with complaints of pain and numbness in her wrist (T. 252).  She explained to Dr. Callahan that her work duties had changed, and that she was typing about 98 percent of the time (T. 252).  On November 2, 2001,  plaintiff again saw Dr. Callahan.  Her symptoms persisted in the right wrist, and she complained of gradual increasing symptoms in the left wrist (T. 252).  Plaintiff was given an injection of dexamethasone sodium phosphate and was prescribed Vioxx for pain (T. 252).

On November 28, 2001, plaintiff again saw Dr. Callahan.  There was no swelling of her wrist, and her grip strength had increased to 67 pounds on the right (T. 250).  Plaintiff had a mildly positive Tinel's sign[3] at the right wrist, with good range of motion of her fingers (T. 250).  At that time, Dr. Callahan stated that plaintiff was totally disabled from her current

---

[3]  Tinel's sign indicates an irritated nerve, typically the result of carpal tunnel syndrome.

job, as she was unable to perform any typing.  He advised her to look for alternate employment (T. 250).

In December 2001, plaintiff had persistent wrist and finger complaints, but her condition was improving (T. 249).  Dr. Callahan again advised plaintiff to look for alternate work and did not "believe that she will be able to return successfully to her prior place of employment without seeing significant deterioration of her right wrist and hand and onset of symptoms of numbness and soreness in the left wrist and hand . . . ." *Id.*  In February 2002, Dr. Callahan stated that "[p]ersistent symptoms and complaints of pain and swelling [in] both wrists warrants further evaluation at this time." (T. 248.) He recommended blood work to check for a possible underlying connective tissue disorder. *Id.*

On April 5, 2002, plaintiff saw Dr. Callahan.  The results of her blood work were normal.  The examination showed "continued swelling along the volar aspect of both wrists with limitations in grip strength and a persistently mild positive Tinel's sign at the right wrist with distal radiation despite prior carpal tunnel release surgery." (T. 245).  Dr. Callahan recommended hand therapy, the use of splints, strength exercises, and a rheumatology evaluation.  Plaintiff was advised to take Tylenol or ibuprofen for pain, as she was unable to tolerate other medications (T. 246).

On August 9, 2002, Dr. Callahan noted that plaintiff had positive Tinel's signs at both wrists, with grip strength of 60 pounds on the right and 70 pounds on the left (T. 240). He stated that plaintiff had "not seen progression of her ability to use either hand despite prolonged splinting, attempts at oral antiinflammatory agent use, cortisone injection, and even right carpal tunnel release surgery." *Id.*  Rheumatology consultation gave "no

additional insight." (T. 241). Dr. Callahan recommended neurological testing and opined that plaintiff was totally disabled (T. 241).

On October 11, 2002, Dr. Callahan advised plaintiff that she could work within the restrictions of no repetitious use of either arm, hand or wrist, no keyboarding activities, and no lifting greater than a maximum of 30 pounds with no frequent lifting of more than five pounds (T. 238). On November 22, 2002, Dr. Callahan noted positive Tinel's sign over each wrist, and grip strength of 65 pounds on the right and 75 pounds on the left (T. 237). He diagnosed bilateral wrist tendonitis and carpal tunnel syndrome in both wrists, and recommended chronic pain management consultation (T. 237).

Plaintiff continued to see Dr. Callahan in 2003. In February 2003, Dr. Callahan noted "minimal improvement" (T. 235). In March 2003, plaintiff slipped and fell on ice. There was no evidence of a wrist fracture, but plaintiff complained of numbness and tenderness in the left wrist (T. 233). By April 2003, those symptoms had resolved, and Dr. Callahan noted a negative Tinel's sign at the left wrist. Plaintiff's grip strength was 65 pounds on the right, 70 on the left, with excellent finger range of motion (T. 231). In June 2003, Dr. Callahan stated that plaintiff's symptoms had increased significantly on the right hand. She was given an injection of dexamethasone sodium phosphate in the right carpal tunnel region (T. 230).

In February 2004, Dr. Callahan recommended bilateral upper extremity electrodiagnostic consultation (T. 226). Plaintiff complained of numbness and tingling in the right hand, and a gradual worsening of symptoms in the left hand (T. 226). In August 2004, the results of the nerve conduction studies were normal, showing no electrodiagnostic evidence for carpal tunnel syndrome bilaterally and no evidence of any

focal or generalized peripheral neuropathic process in the right or left upper extremity (T. 222). Dr. Callahan found these findings "perplexing," as plaintiff showed the clinical signs and symptoms of irritability of both median nerves at the wrists, yet electrodiagnostic studies suggested no neuropathy. Dr. Callahan recommended a neurology consultation, and stated that plaintiff continues to have a "moderate to marked, temporary, partial disability for both upper extremities . . . ." (T. 223). In October 2004, Dr. Callahan stated that he did not anticipate significant improvement in plaintiff's hand function and that plaintiff appeared to have reached a point of maximum medical improvement (T. 220).

Plaintiff was seen at the Dent Neurologic Institute in October and December 2004. In October 2004, Dr. Kenneth Murray stated that plaintiff's symptoms were "suggestive of neuropathic pain involving the right upper extremity." (T. 276.) Plaintiff was prescribed Relafen and Neurontin. In December 2004, Dr. Murray stated the possibility that plaintiff suffers from a "small fiber neuropathy involving unmyelinated C fibers" which would not be apparent from nerve conduction studies (T. 274). He recommended that plaintiff be seen by Dr. Bennett Myers, a subspecialist in neuromuscular disease. In January 2005, Dr. Myers opined that plaintiff suffers from bilateral complex regional pain syndrome which was likely triggered by carpal tunnel syndrome (T. 271). Plaintiff's symptoms suggested a pathology of the median nerves, although the nerve conduction studies were normal (T. 271). On a form for the Department of Social Services dated February 14, 2005 and referencing his January 2005 examination, Dr. Myers wrote that plaintiff was unable to do any work due to persistent dysesthesia in her hands and that the onset of her disability was "2000" (T. 268).

In an RFC assessment dated August 12, 2002, D. Hart, a state analyst, opined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours, and push and/or pull without limitations (T. 52). The only limitation noted was for fine manipulations of the fingers (T. 54). This assessment appears to be based on the "Request for Medical Advice" of Dr. Janis Dale dated July 8, 2002, in which she stated that plaintiff could do light work with restrictions for fine manipulations and repetitive hand movements (T. 127). The analyst noted the treating physician's opinion that plaintiff was totally disabled, but stated that the treating doctor "[d]id not respond to attempt for clarification therefore this issue is reserved for the Commissioner." (T. 57). Plaintiff underwent an examination by a medical consultant in October 2003. At that time, Dr. Steven Dina found plaintiff's hand and finger dexterity intact with normal grip strength (T. 202). He noted no motor or sensory deficits, and no functional limitations (T. 202). Another state analyst came to the same conclusions as to plaintiff's exertional limitations in November 2003 (T. 106). D. M. Kornaker found limitations for gross manipulations, including repetitious movements of the right hand and wrist (T. 108). The analyst also noted that plaintiff's treating physicians did not quantify plaintiff's limitations, and that their opinions were therefore not adopted (T. 111).

**IV.   Other Evidence**

At the hearing, plaintiff testified that she completed high school and some college courses (T. 297). Her problems with her wrists began in early 2000 (T. 299). After her surgery, she experienced some improvement and was able to return to work, but the typing damaged her wrists further (T. 301). She has been treated with physical therapy, cortisone

10

injections, and pain medications (T. 302). She also wears splints on her wrists (T. 306). Plaintiff stated that she finds it difficult to concentrate and gets very sleepy when she takes hydrocodone for pain (T. 303). She also takes Celexa for depression (T. 304).

Plaintiff is divorced and lives with her teenage son (T. 294). He helps her with housework, laundry, shopping, and cooking (T. 309). Plaintiff stated that she is comfortable occasionally lifting five pounds (T. 310). She has no trouble standing, sitting, or walking (T. 311). Plaintiff states that her wrist pain makes it difficult to concentrate (T. 312).

Jay Steinbrenner, a vocational expert, testified that plaintiff's previous work as a data entry clerk, and typist were semi-skilled sedentary positions (T. 312). Her previous work as a blueprint machine operator was a semi-skilled light exertion job (T. 312). Assuming a person of plaintiff's age, education and work experience, with restrictions for pushing, pulling, sustained overhead lifting or reaching, the use of vibrating power tools, air pollutants, and temperature extremes, Mr. Steinbrenner stated that such a person could perform about 25 percent of light jobs and about 70 percent of sedentary jobs (T. 314). Such jobs would include usher or lobby attendant, school bus monitor, teacher's aide, information clerk, telephone marketer/solicitor, collection clerk, and customer service/complaint clerk (T. 315-17).

**V.     The Treating Physician Rule**

Plaintiff argues that the ALJ's decision to reject the opinion of Dr. Bennet Myers, who opined that plaintiff was unable to do any work, was error. She argues that Dr. Myers examined the plaintiff, found that she suffered from bilateral complex regional pain

syndrome, and stated that significant improvement was not likely. The ALJ rejected Dr. Myers' opinion because "it was based on the claimant's subjective complaints and not by his own examination . . . ." (T. 19). Additionally, plaintiff states that the ALJ failed to consider the findings of her other treating physicians, particularly Dr. Callahan, in determining that she is not disabled.

It has long been recognized that the opinion of a treating medical source is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). In determining the weight to be given to a treating source's opinion, the ALJ must consider: (1) the length, nature and extent of the treatment relationship; (2) the frequency of examination; (3) the evidence presented to support the treating source's opinion; (4) whether the opinion is consistent with the record as whole; and (5) whether the opinion is offered by a specialist. 20 C.F.R. §§ 404.1527(d); 416.927(d).

When controlling weight is not given to a treating source's medical opinion, the ALJ must explain his reasons for the weight he does assign to that opinion. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand") (internal quotations omitted). Furthermore, in analyzing a treating physician's opinion, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion," nor can he "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater*, 142 F.3d 75, 81

12

(2d Cir. 1998) (quoting *McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)).

Here, the ALJ rejected the opinion of Dr. Myers because he stated that the opinion was based on plaintiff's subjective complaints, not on his examination of her. This was error. The form completed by Dr. Myers references his examination of the plaintiff on January 11, 2005 (T. 268). The record indicates that Dr. Myers is a "subspecialist in neuromuscular disease" and his opinion was sought by Dr. Kenneth Murray of the Dent Neurologic Institute after plaintiff was referred to Dent for a neurologic consultation (T. 274). Dr. Myers stated that plaintiff's symptoms "suggest a problem with small fiber dysfunction" and suspected that she suffers from bilateral complex regional pain syndrome (T. 271).

Dr. Myers is one of plaintiff's treating physician, although he appears to have only seen her on one occasion. He is a specialist in neuromuscular disease, and his opinion was based on an examination of plaintiff and review of her electrodiagnostic studies. Dr. Myers' opinion that plaintiff is unable to do any work is inconsistent with the opinion of the state disability analysts and consultative physicians who concluded that plaintiff could do sedentary and some light work. However, Dr. Myers' opinion is not inconsistent with that of plaintiff's primary hand physician, Dr. Callahan. During the course of her treatment with him, Dr. Callahan stated that plaintiff could not return to her previous work as a typist or data entry clerk. In October 2004, Dr. Callahan stated that plaintiff had reached the point of maximum medical improvement without significant improvement in her hand function. Dr. Callahan consistently stated that plaintiff suffered from a moderate to marked partial disability.

If the treating physician's opinion is not given controlling weight, the ALJ is required to consider the six factors enumerated in the regulations, and provide a good reason for the weight, if any, to be given to such opinion. 20 C.F.R. § 404.1527(d)(1)-(6) (2000). Here, the court finds that the ALJ failed to elaborate on these six factors, and the only stated rationale in his rejection of Dr. Myers' opinion was erroneous. Consequently, the court finds that the ALJ did not apply the correct legal standard in assessing Dr. Myers' opinion that plaintiff is unable to work. Upon remand, the ALJ is instructed to consider that Dr. Myers examined the plaintiff and his opinion was not based solely on plaintiff's subjective complaints. If the ALJ chooses to reject the opinion of Dr. Myers, he must consider the requisite factors and clearly articulate the reasons for his decision. Additionally, the ALJ should address the opinion of treating physician Dr. Callahan as to plaintiff's residual functional capacity. If Dr. Callahan's opinion is also rejected, the ALJ must state his reasons in accordance with the regulations.

**VIII.   Plaintiff's Residual Functional Capacity**

Plaintiff contends that the ALJ erred in adopting the RFC determination of the state agency analysts. These analysts both noted that there was no quantification of plaintiff's exertional limitations by her treating physicians in the record. If the medical evidence received from treating sources is inadequate, it is the responsibility of the ALJ to recontact the medical sources to obtain sufficient information and properly develop the record with respect to plaintiff's RFC. *See* 20 C.F.R. § 404.1512(e). Here, none of plaintiff's treating physicians completed an assessment of plaintiff's RFC to assist the ALJ in determining

plaintiff's exertional limitations and ability to work. Upon remand, the ALJ should request an adequate RFC assessment from plaintiff's treating physicians.

## IX. The Vocational Evidence

Finally, plaintiff argues that the ALJ erred in accepting the VE's testimony that plaintiff could perform skilled jobs after the ALJ concluded that plaintiff had no transferable skills. The VE testified that plaintiff could perform the light exertion jobs of usher/lobby attendant (unskilled), school bus monitor (unskilled), teacher's aide (semi-skilled), and the sedentary jobs of information clerk (semi-skilled), telephone marketer (unskilled), collection clerk (skilled), and customer service clerk (skilled). With respect to the job of information clerk, the VE testified that such a person would provide "information and a point of entry for large commercial office buildings and . . . [direct] people to appropriate offices or locations." (T. 315). The skill "comes in the knowledge of the offices or locations within a facility." *Id.* The ALJ apparently rejected the VE's testimony regarding the position of collection clerk because it involved significant keyboarding (T. 22, 317). In explaining plaintiff's RFC, the ALJ stated that plaintiff could do "no significant writing or operation of computer/keyboards." (T. 22.)

The ALJ did not err in accepting the VE's testimony that plaintiff could perform certain "skilled" jobs. The ALJ's findings that plaintiff had no transferable skills from her previous work is not inconsistent with his determination that she could perform semi-skilled or skilled jobs. "Skills" are not defined in the regulations, but are elucidated in Social Security Ruling 82-41, 1982 WL 31389 (S.S.A. Feb. 26, 1979). Skills are "practical and familiar knowledge of the principles and processes of an art, science or trade, combined

15

with the ability to apply them in practice in a proper and approved manner. This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery." SSR 82-41, 1982 WL 31389, *1. Skills are "transferable" "when the skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1). Here, the ALJ's finding of no transferable skills was a recognition that plaintiff could no longer do the typing and keyboarding that she had previously done.

Plaintiff's inability to do significant writing or computer or keyboard operation does not preclude her from doing some semi-skilled or skilled work. Semi-skilled work requires some skills "but does not require doing the more complex work duties." 20 C.F.R. § 404.1568(b). Such jobs "may require alertness and close attention," or "inspecting, testing or otherwise looking for irregularities . . . ." *Id.* "Skilled work requires qualifications in which a person uses judgment" or "may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." 20 C.F.R. § 404.1568(c). "These descriptive terms are not intended, however, to illustrate types of skills, in and of themselves. The terms describe worker traits (aptitudes or abilities) rather than acquired work skills." SSR 82-41, at *3; *see also Draegert v. Barnhart*, 311 F.3d 468, 476 (2d Cir. 2002) (ability to "learn and apply rules and procedures," to "use reason and judgement," to "think clearly and react quickly in an emergency," to "keep physically fit," to "make conclusions based on facts and on one's personal judgment," and to "change easily and frequently from one activity to another" when not linked to any particular tasks, are merely traits or aptitudes, not job skills).

The court finds that the ALJ did not err in finding that plaintiff could do some skilled and semi-skilled jobs. Upon remand, however, the ALJ should carefully consider the work plaintiff is capable of performing, given the limitations of her hand functions.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Item 11) is denied, and plaintiff's cross-motion (Item 13) is granted. The matter is remanded for further proceedings in accordance with the fourth sentence of 42 U.S.C. § 405(g).

So ordered.

                                                   \s\ John T. Curtin
                                                   JOHN T. CURTIN
                                                   United States District Judge

Dated:   ~~January~~ 2/14   , 2007
p:\opinions\05-559.jan807